SLIP SCARF CO. v. CHURCH, WEBB & CLOSE, Inc.

(District Court, S. D. New York. January 17, 1916.)

PATENTS ⬤═328—INVENTION—NECKTIE.

The Mills patent, No. 1,109,858, for a necktie, *held* void for lack of invention, on satisfactory evidence of prior public use by two or more others, who manufactured similar ties for the market.

In Equity. Suit by the Slip Scarf Company against Church, Webb & Close, Incorporated. On final hearing. Decree for defendant.

This is the ordinary complaint in equity for the infringement of patent to Mills, No. 1,109,858, for a new kind of neckwear. The claims in issue are 4, 5, 6, and 7, which are as follows:

4. "A necktie formed of suitable fabric folded and shaped in a flat tubular form, embodying a narrow neckband portion and tying-end portions at the ends of the neckband portion, the edges of the back fold of the folded fabric in the tying ends being intermediate the edges of the tie, and interlining in the tying-end portions, and stitches in the tying-end portions attaching the interlining to the back fold only of the tie throughout the tying ends of the tie whereby said stitches will not appear on the outer face of the tie."

5. "In a necktie having a neckband and two tying ends formed of a fabric material cut and folded to form the face and back of said necktie, the edges of said material meeting on the back of the tie intermediate the edges of the tying ends and a reinforcing strip extending substantially throughout the length of said necktie and secured to the fabric of the back only of the tying ends of said necktie."

6. "A necktie formed of a folded fabric and comprising a narrow neckband portion, knot-forming portions at the end of the neckband portion and enlarged ends, the edges of the folded fabric forming a longitudinal seam at the back of the tying ends of the necktie in combination with a longitudinally extending, relatively strong, inelastic flexible reinforcing strip reinforcing the back of the scarf throughout the neckband and a substantial portion of the tying ends thereof, longitudinal stitching connecting said reinforcing strip to the back fold only of the said folded fabric throughout the said knot-forming portions, and lines of stitching connecting said reinforcing strip to back and face folds of the tie throughout the neckband portion thereof."

7. "A necktie formed of suitable fabric folded and shaped in a flat tubular form, embodying a narrow neckband portion and wider tying-end portions at the end of the neckband portion, the edges of the back fold of the folded fabric in the tying ends being intermediate the edges of the tying ends of the tie, an interlining in said tying-end portions, a reinforcing strip extending throughout the neckband and the tying-end portions, said strip being substantially equal in width to the neckband portion, and stitches attaching the interlining of the tying ends, to the back fold only, of the said folded fabric throughout the tying-end portions, so arranged that said stitches will not appear on the outer face of the tie."

Nothing need be said regarding infringement, since the case goes off upon the issue of validity. The patentee is a lawyer, associated with the well-known firm of Kenyon & Kenyon, who had charge of the conduct of another litigation in this court before Judge Mayer concerning a patent to Kays, a large manufacturer of neckwear, whom Kenyon & Kenyon represented. During the course of that litigation Mills devised the patent now in suit, the novelty of which consisted in introducing a strip of unyielding material, like muslin, within the scarf proper, usually made of soft material, such as silk, and frequently cut on the bias. In addition there was put within the tying ends of the scarf an interlining, such as light flanel. The muslin "reinforcing strip," as it is called, was stitched to the interlining and the two stitched to the back of the scarf in the tying ends, so that no stitching should be seen from the front. In the neckband the reinforcing strip was stitched firmly

through the material of the scarf. The result was to put the strain of the pull upon the reinforcing strip and to relieve the flimsier fabric of the scarf. Claim 4 is for the interlining alone in the tying ends, stitched to the fold of the scarf; the fold being at the back and between the scarf edges. Claim 5 is for the reinforcing strip, stitched to the back only, of the tying ends in the same way as the interlining in claim 4. Claim 6 is for the reinforcing strip stitched to the fold at the back only of the tying ends, and through both front and back of the scarf over the neckband portions. Claim 7 is for the combination of reinforcing strip, interlining, and stitching to the back only of the folds of the tying ends.

At the trial the issue of infringement was not seriously contested, but the defendant put in evidence numerous patents for scarfs, approaching more or less near to the patent in suit, and also attempted to prove five distinct prior uses. These were of scarfs made in New York before the date of the invention, May 31, 1912, by the following neckwear manufacturers: Bachrach, C. Stern & Mayer, Oppenheimer, Franc & Langsdorf, James R. Keiser, Incorporated, and J. J. Riker & Co. The plaintiff does not dispute that these scarfs, if proved, would anticipate, but does assert that no one of them has been proved. In addition the defendant insists that Mills borrowed his invention from an exhibit in the former suit, a scarf made by Blanchard & Price, in professed accordance with a patent to Blanchard, No. 954,017, which was put in evidence.

Alan D. Kenyon, of New York City, for plaintiff.

Joseph L. Levy and William R. Davis, both of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above). I shall first consider the alleged prior use of C. Stern & Mayer, and then that of James R. Keiser, Incorporated. These in my judgment dispose of the patent.

On February 7, 1911, Ackerman, a salesman for C. Stern & Mayer, took an order for scarfs from Gaston Heilbroner amounting in price to $95.06, the order for which in Ackerman's hand is in evidence and cannot be questioned. There were three separate forms of scarf specified in this order, "345," "like shape," and "320." Nothing turns upon forms "345" and "320," and as they were apparently stock forms they may be omitted. The phrase "like shape" reasonably means made after some form then first submitted, and Ackerman says that Heilbroner gave him a form which he was to copy for that part of the order. This testimony fits in so closely with the written order as to be free from any reasonable doubt. Seven dozen "like shape" scarfs were ordered to be made up of 13 separate patterns of silk, indicated upon the order by 13 separate numbers. Each of these numbers indicates a separate silk pattern, and is contained in a swatch-book comprising the period of the order, February, 1911. The practice of the manufacturer was to cut pieces off the various patterns of silk when he first received them, and to give each pattern a number, and paste the piece along with its number in the swatch-book. The appropriate entries from this swatch-book corresponding to the numbers of the silks contained in Ackerman's order "like shape" were put in evidence without objection.

At the trial there was produced from the custody of C. Stern & Mayer a scarf made up of the same silk as was found in the swatch-book under No. 1146, which was one of the 13 patterns used to fill the

"like shape" part of the order of February 7, 1911. To the back of this scarf was affixed a label bearing the words, "Gaston Heilbroner, 302 Third Avenue, New York Smart Haberdasher." The scarf itself is made in such a way as to anticipate the patent in suit. So far the proof is of such a kind as admits of no doubt whatever. The missing link is the proof that the scarf in evidence is made in accordance with the form submitted by Heilbroner and denoted by "like shape." To supply this link the defendants produce the testimony of Stemsky, their manager of manufacturing, of Heilbroner, and of Ackerman. It may be granted to the plaintiff for argument that even the combined testimony of these three men, of whom Heilbroner, at least, must be held to be absolutely impartial, would not be enough to supply the degree of proof necessary in such cases. Is there anything else? Heilbroner swears that he had only one shop while in business, and that it was at 302 Third avenue, New York. This shop he gave up in June, 1911, and went into the employ of Weber & Heilbroner, where he now is. It is true that we have no independent documentary evidence of the time when he gave up this shop, and if anything turned upon its being in June, 1911, the case might fail. We cannot suppose, however, that a man would be wrong about the season and year in which such a thing happened in his life, at least within the past five years. We may take it as established beyond a reasonable doubt that Heilbroner closed his shop during the summer of 1911.

How, then, are we to account for the existence of the scarf in evidence, Exhibit O, with the label, "Gaston Heilbroner," etc. Obviously, taken alone, the scarf proves nothing; it could have been made up at any time. Yet every act must have a motive, and what possible motive could there be in making up such a scarf with such a label after Heilbroner had closed his shop? We have as the only alternatives either to suppose that the scarf, Exhibit O, was in fact one of those made for Heilbroner from pattern 1146, which we know to have been received at about the time of the order, or to suppose that it was made up after May 31, 1912. It may perhaps be admitted that it might have been made up afterwards, were it not for the label, securely sewed to the back, indicating that it was made for Heilbroner at 302 Third avenue. I lay aside the possibility of deliberate fabrication, which the plaintiff does not assert, and which is not to be assumed in the absence of proof. No other possibility occurs to me which would account for the presence of the label, if the scarf was made up after Heilbroner went out of business. The label is a separate piece of fabric sewed on with some purpose, and it seems to me most unreasonable that it should have been put onto a scarf made up for anybody else. If it was intended only as a sample to be kept in the factory for reference, why should any label at all be put on? Or if any label was put on, why should Heilbroner's be selected a year after he had stopped business? The rule of proof does not require the exclusion of every conceivable whimsy of doubt which capricious ingenuity may invent. Short of some such mental exercise, I can see no explanation for this scarf, made as it is, except that it was one of

those made under Ackerman's order and retained as a sample of the new form, "like shape," which Ackerman says Heilbroner gave him and in following which the silk pattern found in the exhibit was with others to be used. The recollections of Stemsky, Ackerman, and Heilbroner, therefore, appear to be corroborated in such a way that nothing short of deliberate fabrication will account for the facts. Therefore I find that the prior use of C. Stern & Mayer has been proved.

As to the J. Keiser & Co. use the facts are as follows: Ruston, the manager of manufacturing, produced three scarfs, $J^1$, $J^2$, and $J^3$, which had come from the possession of the manufacturer, and which Ruston recognized as of the make of the company put upon the market in 1915 and 1916. He had got them from the foreman, whom he had told to search for them in the sample box in which the manufacturer kept samples of all new shapes as they were put out upon the market. Sarah Steele, the forewoman, also recognized the scarfs as of the manufacture of the company, and she placed them by virtue of their silk at the same period. She had told the foreman where to get them.

The defendant insists that this testimony of Ruston and Steele has not been sufficiently corroborated by contemporaneous documentary evidence to put it beyond reasonable doubt. The link is the fact that the silks of which $J^1$, $J^2$, and $J^3$ are made were issued once, and once only, all before January 1, 1907. This is proved beyond the least possible doubt as follows: Nellie Lees was in charge of a card index system for keeping track of silks. The factory, when it issued a new silk, gave it a number as it came to Nellie Lees, which she put upon a new card in her index, cutting off a sufficient piece for identification and pasting it on the same card. When samples of the silk were issued to salesmen, Nellie Lees checked with the date against their names on the back of the card, and checked again in red when they returned the samples. If the silk was reported out, she noted it also upon the card. The cards show that the latest of these silks, $L^1$, was issued late in December, 1906, and was reported out on January 29, 1907. If any second issue of the same silk was made, it would be again checked upon the card.

The plaintiff says that, if the silk was duplicated at a later period, it would receive a new card and a new number. It is mistaken in so understanding Nellie Lees' testimony. She never made out a new card unless the factory sent her a new number with the silk. She made no effort to look for old silks when the factory sent her a silk, but relied wholly upon the factory. Since these silks are all reported out, any mistake in putting an old silk upon a new card would therefore arise from a mistake of the factory in failing to keep a proper record of its silks. The questions, 58–61, on which the plaintiff relies, do not prove what it thinks. In that portion of her testimony Nellie Lees was apparently speaking of her comparison of samples returned by salesmen with the swatch-cards to find the right ones, though it is not certain that she and her questioner were understanding each other. Be that as it may, the whole of her testimony leaves no doubt that she relied on the factory for her new numbers.

Now it is of course possible that once a factory should give an old

silk a new number, and that therefore there might be another undiscovered card in Nellie Lees' card index with the same silk as $J^1$, $J^2$, and $J^3$, but that this should happen three times, and should happen to just these scarf patterns, is much more than three times as unlikely. We may therefore say with every reasonable certainty that these scarfs were made at about the time when the silks were issued, and that they were made up for the salesmen to take out with them, because for about every ten silks one scarf pattern would be made up. A sample was then returned to the sample box of each scarf pattern, but not of each silk. The idea that these three were all made up over five years after they had been reported out seems to me fantastic. Yet there is an added corroboration, not sufficient alone, perhaps, but still significant. To each of these scarfs is attached a pin ticket, which it was customary for the superintendent, Loomis, to put upon each sample kept in the sample box, which designated the scarf pattern. Loomis had left the employ of Keiser, and Sarah Steele said she did not know his whereabouts; had he been called, his testimony as to each particular pin ticket could hardly have added anything of value. We find a pin ticket with the No. 1551 on $J^1$, and we find sales in substantial quantities of No. 1551 during the first three months of 1907, to fill the orders which salesmen were making as shown by the swatch-card, $L^1$. Leaving out of account deliberate fabrication, the plaintiff can account for the correspondence between pin ticket and sales only on the possibilities, either that there was another sample 1551 in the sample box, or that the pin ticket had been misplaced. That there should be another sample with the same number is most unlikely in itself, and as to both possibilities the chance is reduced to negligible force by the fact that the silk of $J^1$ was used only in that period. The idea that it was made of a chance remnant at a subsequent time, when the manufacturer did not mean to run that silk, no one would seriously urge. The correspondence of pin ticket, sales, and silk seems to me so strongly to corroborate Steele and Ruston that the result admits of no reasonable doubt.

The Bachrach use seems to me to be thoroughly established through the corroboration of Fanny Lewis' testimony through her entry, "Muslin strip all ov." on Sero Sq. The entry, "New Sero 1912," at the top, I have no doubt was a subsequent entry. No one can read this testimony without, in my judgment, being satisfied that Bachrach made the scarfs before May 31, 1912; but there is undoubtedly some technical, highly technical, difficulty in the proof of the swatch-books, and rather than rest the case upon a question of evidence not absolutely certain, I prefer to make no finding upon the Bachrach use.

The Oppenheimer use is perhaps weaker than Bachrach's, and is subject to the same possible weakness in the proof of the swatch-books. I make no finding upon it, though I have no question in fact that Oppenheimer made the ties as is claimed.

The Riker use is the weakest of all; I should think there might be an honest doubt regarding it.

The Blanchard patent, No. 954,017, left a very small scope for invention if there was any at all. The reinforcing strip is clearly dis-

closed from end to end and the interlining in the tying-ends. The disclosure is of a bow or butterfly tie, not a scarf; but no invention certainly can lie in the change. Mills' only novelty over Blanchard rests in the stitching of the strip, lining, and silk in the tying ends to the back folds of the scarf. This Blanchard did not show, but Tatton, 1902 British, 14,289, shows a reinforcing strip stitched to the back only of the scarf, and a long scarf at that. I can attach no importance to the fact that the silk is not brought together into one fold at the back, but is stitched to the reinforcing strip in two seams. If Tatton had put in his interlining in the tying-ends, I should have certainly been unable to see any patentable novelty between him and Mills. Thus invention can rest only in combining the two disclosures of Blanchard and Tatton, and I am extremely doubtful whether the patent could stand if it did not have to meet prior uses. It seems to me to be one of those trifling readjustments of well-known forms which ought never to have escaped the examiner. In any case it was not the work of a manufacturer seeking to satisfy that cherished friend of courts, the long-felt want. Rather it was a bit of academic ingenuity by a lawyer, whose imagination was stirred by a litigation which certainly came very close to his supposed invention. I need not find that Mills saw the Blanchard & Price scarf, or that it was a prior use itself. I cannot disregard the fact that there existed the precise invention corporeally embodied and within his very grasp. That certainly should have some bearing upon the difficulty of taking the step which he took to unite Blanchard and Tatton.

Bill dismissed, for want of invention, with costs.